6-0-8-9-7, United States Army Corps of Engineers, Harrison County, Mississippi. I don't want to mispronounce your name, so. Thank you. We're ready for you. Good morning. May it please the Court, I'm Robert Weigel. I'm here this morning on behalf of Harrison County, Mississippi and six other counties and municipalities in Mississippi as well as commercial fishermen and those who are in the tourism trade on the Mississippi Coast. Now, I'm mindful of the Court's instruction not to spend a bunch of time on the facts, but our appellate briefing is sometimes a peculiarly bloodless form of advocacy. And we're here because the unprecedented twice in a single year and back-to-back, year-to-year openings of the Bonnie and Carrie spillway, which is an inseparable part of the Mississippi River and Tributaries Project, caused damage that can really be called devastating to those who depend on the Mississippi Sound and the Gulf of Mexico along the Mississippi Coast for their livelihoods, for their spiritual, for their recreational and other kinds of well-being. Now, as you know, this case was dismissed for lack of jurisdiction. It was brought under the National Environmental Policy Act. And I think the purpose of the National Environmental Policy Act is an important underpinning for this. As you know, it's an action-forcing statute. And at bottom, what it says is, you federal agency, when you are taking a major federal action that may significantly affect the human environment, you should look at it and you should look at the alternatives and the public should have their shot at those alternatives. And as a number of cases have said, that is a fundamental part of the democratic process, which can be used to influence the agency. It can be used to go to Congress. That information is critical and it is important. The 1976 Environmental Impact Statement for the Mississippi and River Tributaries Project is the last time that we had a full look at that project and that looked at the Bonnie and Carrie spillway element of that project. Now, we brought this case for review under the Administrative Procedure Act, Section 706.1, commonly called a failure-to-act case. And that requires a discrete agency action that the Corps of Engineers was required to take. And here we are looking at a shall regulation, the language is mandate. And that is 40 CFR 1509D. There is a major federal action remaining to occur in one of two circumstances. It's present substantial changes to the project, significant new circumstances or information relevant to environmental concerns. Now, this is a specific unequivocal demand to use the parlance from Southern Utah Wilderness Alliance and the Supreme Court. Now, the district court here found, the court argued and the court found that there is no major federal action that would implicate this shall mandate and require supplementation here. Now, to evaluate that, I think it's critically important to look at what were we looking to supplement, right? And that is the 1976 Environmental Impact Statement, almost 50 years old now. It is on operation and maintenance of the mainstream project, maintenance of project features and completion of those authorized features. That is what they set out and that document is what they were looking at. And it looked at the Bonnie and Carrie spillway in the context of those matters. Both the completion of project features and operation and maintenance. And what we got there was about a page and a half. And it said, yes, there are going to be some impacts on oysters and yes, it's going to push some shrimp out. But what it did not go into was kind of wholesale regional impacts and believe me, these were devastating impacts on the Mississippi Gulf Coast that we saw with these unprecedented lengthy back-to-back openings of the Bonnie and Carrie spillway. So, and it makes sense that that EIS looked at this thing, the project as a whole and the operations and maintenance because the key factor of the Mississippi backwater areas, spillways that all act together, physical projects, physical aspects of this project that act together to deal with the project flood. Now, that's important because the core here focuses on the Bonnie and Carrie spillway itself and they say, well, you haven't given us a and that's correct. We have. But that's an integral part, as they concede, an inseparable part of this larger project that works together with each aspect of it. You can't tease one piece of that out from the other. The levees drain the river and the levees, by the way, affect the way that the river behaves. This is a river that, for good reasons, over time has been cut off from its natural flood plain and therefore does not have the upstream storage that it used to have and that affects what comes downriver here. Now, and again, the core says that we're only going to, we're only going to find major federal with regard to the subject of analysis, but the subject of analysis in that 1976 EIS was operations and maintenance and it looked up and down and looked at the Bonnie and Carrie spillway as an element of that. And I think it's important here to note again, I don't think it's contested that there were major significant impacts to the human environment. And what the regulations for the National Environmental Policy Act say is that major does not have, it doesn't have a meaning independent of significant. Significant gives us a whole laundry list of things, most of which come into play when you look at what happened. Are we supposed to look at the consequences of an ongoing policy? Are we supposed to look at whether the federal government has taken action? I think that whether the agency, I think you cannot divorce the consequences of the action itself or of the policy itself. Well, except that's not what the statute says. The statute could have easily said, do a statement when there's major environmental consequence. What it instead says is major federal action. It does. And it says... Are you trying to equate the two? I'm saying what the law has been, major does not have a meaning independent of significantly. And Judge, I understand the point you're getting at is... We're ignoring the federal action part of the language. Right, but... Let's stipulate that major, significant, substantial, that's all in the same rubric. The question is what are we modifying? Are we modifying consequence to the environment, as you insist, or are we modifying federal action? I think they're not unrelated, but the federal action that we have here is... Well, one, there are two points I'd make, Judge, if I may. One, this is not a completed federal project. If you look at the entire Mississippi River and Tributaries Project, which is what they looked at in the 1976 EIS, you still have levy work to be done. You have some billions of dollars of work that is authorized for this project. So that's one thing, and that's Marsh v. Oregon Natural Resources. Is your theory then that any sort of ongoing project, even if the federal policy is unchanged during the course of that project, that would be enough to constitute a federal action? It's where there's... Continued implementation? Yeah, there's still construction left to occur within the project that... What's your best authority for the proposition that you don't need a policy change of any kind? All you need is continued implementation of a preexisting policy? Right. It's... Okay, so let me separate out two things. One... I'm just asking you what's your best authority. Sure. Best authority for that is those cases out of the Ninth Circuit. For example, the Idaho case we talked about, and it said, okay, you looked at it, and that was lake levels, Bonneville Power Administration case. That was lake levels, and they said, okay, here we had an EA. The consequences here are no different from what they were before. So I think even those cases are going to look at what the consequences are. This is ongoing for 50 years, right? It is. How often would the government have to do a new environmental impact statement under your reading of the statute? That would fall under the rule of reason, which is implicit and explicit in all cases, and they're going to be protected from getting into an intractable review of all sorts of cases by the fact that if you have consequences that are within the range, reasonably, of what was originally seen for the project, then you do not have to do any supplementation. Give me some demarcations along this 50-year timeline of when there was a major federal action that triggered that obligation. What was it? That was in 2019, and that is when you look at those cases and the Ninth Circuit cases, which have persuasive presidential value for this Court. They said, what we're looking at here, is there anything different from what was contemplated? And the best evidence of what was contemplated was what Major General Jadwin said. He's still with us today in his report, right, where he said about every six years, they have had different estimates of how often this particular feature would have to be operated. But it's been anywhere from six to ten years. That's just operational. I mean, that's just dependent on circumstances, not something that the federal government is doing to change the project, expand the scope of the project, is it? It's not, and that is if you're just looking at operations. Now, if you're looking at the project itself, right, where you have deficient levies that are remaining to be raised, that $4 billion, roughly, of things that are remaining to be done. So are you opposing raising the levies? I'm sorry? Are you opposing raising the levies? No. No, and we want to be clear about that. The Corps does have the discretion to take action to protect public safety. That is certainly true, but that's a different proposition from whether there's remaining work to be done. If they just did an environmental impact statement about raising the levies and there was going to be an adverse impact, what would be your position? I mean, I'm trying to connect this with what relief you want. The important point about doing that would be that you would be looking at alternatives and different things that could be done rather than So you are objecting to raising the levies? No. No, Your Honor, I don't think that's a correct characterization of what I'm saying. What I'm saying is that if they were looking at raising the levies, then they could look at alternatives to raising the levies, which in the case of the Mississippi River and Tributaries Project, would include things like diverting some water down the Atchafalaya Basin or in other cases perhaps work upstream, work on the channel to make it more efficient. So you are opposing, that's what I'm trying to get at, you are opposing raising the levies? No, Your Honor, we're not. Counsel, if we agreed with you, what is it that you would expect us to include in our opinion? If you prevailed, you want an environmental impact statement? Is that what you want the court, the district court to order? And now you want this court to order? Supplement to the 1976 environmental impacts. And that's it? I mean, there's no monetary damages or anything at this point? I mean, those are all causes of action perhaps? Perhaps. That others may have. What you want, the relief you seek, is an environmental impact statement or a supplement to the previous one, is that correct? A supplement to the previous one, that is correct, Your Honor. Has there been any attempt to obtain that extra-judicially through either the EPA or through Congress or some other agency that might have some expertise and a willingness to make that assessment on all of the ills that you are describing from the spillway being opened? There have been, Your Honor. I take it to no avail since we're here. Not at this point. I want to go back to our discussion about the definition of major federal action. You said your key case was an Idaho case. Are you referring to the Idaho Conservation League versus Bonneville? Yes, Judge. All right. So as I read that case, it says, quote, when an agency responding to changing conditions makes a decision to operate a completed facility within the range originally available to it, the action is not major. How do you respond? I respond that what they were talking about there and what the case is typically used is was it contemplated at the time of approval of the action. Here it was not contemplated that we would have these back-to-back extraordinarily damaging. So this is a dispute as to what the original range under the previous plan would have accepted? Under that, if we're just looking at the operations of the Bonne and Cary spillway, I think that's right. I would agree with you about that. So, again, what you're focusing on is, it seems to me, the back-to-back or the increased frequency of releases. It's increased frequency as well as the fact that because of changes in the river which are related to the Mississippi River and tributaries project itself, it's now But the action that the Corps takes that's resulting in this damage is release. It's opening the gates. It is opening the gates. That is correct. All right. Thank you very much. Rachel Heron. May it please the Court. My name is Rachel Heron on behalf of the United States Army Corps of Engineers. Nearly a century ago, after a historically devastating flood cost lives and homes, Congress made a choice. It directed the Corps to construct the Bonne and Cary spillway and it set the still-governing operational criteria for when the Corps must open that spillway. Thirty years later, when Congress enacted NEPA, it made another choice. It could have but did not craft a retroactive statute that would retroactively impose analytical burdens with regard to already-constructed federal projects. Instead, it created a stop, look, and listen statute that applies when an agency operating an existing federal facility or infrastructure project changes the status quo with regard to the operational policy. Because plaintiffs have not identified any relevant major federal action constituting a change to the status quo relevant to Bonne and Cary, and because the Court cannot compel the Corps to take an action which is not encoded in a legally required duty, the District Court correctly dismissed. For the Court's awareness, because this case can be affirmed on the ground that was presented to and decided on by the District Court, I intend to focus there and leave for whatever time remains. Any questions Your Honors may have on the alternative, broader ground for affirmance noted in the federal government's brief that an action to compel a pre-decisional environmental analysis untethered from any final agency action is not cognizable in any event. Plaintiffs have presented two candidates for what they think the relevant major federal action that could serve as the hook for their NEPA argument are. However, neither of those are actually major federal actions within the meaning of the statute and as that statute has been interpreted by the courts. The first that the plaintiffs focus on is the mere fact that the Mississippi River and Tributaries Project, of which the Bonny Cary Spillway is one structure, is ongoing. That there is construction on some other elements, not the Bonny Cary Spillway itself. It is uncontested that construction of that structure has been complete since 1932. Plaintiffs rely on the Supreme Court's decision in March to argue that the ongoing construction in the project triggers a duty to perform a supplemental analysis of the Bonny Cary Spillway. But the March decision is clear that the focus of any supplemental environmental analysis that is required by ongoing construction is, in the Supreme Court's words, the remaining action. Here, plaintiffs aren't concerned with the remaining action in the larger Mississippi River and Tributaries Project, which at present is construction on the levees in the main stem. As counsel said earlier today, they are not challenging the decision to continue to perform work on those levees to get them up to grade. And in fact, as is noted in the briefing, the court did perform a supplemental environmental impact statement when it proposed to take that new action with regard to the levees. Plaintiffs have not challenged that supplemental environmental impact statement in this lawsuit, and I am not aware that they participated in the environmental analysis on that levee project. To the extent, as plaintiffs' counsel suggested today, there is some question as to whether an analysis of the levee project that is ongoing should have included some kind of consideration of its possible effects on Bonny Cary Spillway. That is an argument that should be brought, if at all, in a challenge to that supplemental environmental impact statement. It doesn't provide a freestanding duty for the court to go back and perform an environmental impact statement of an action and a structure that is entirely complete. The second option that the plaintiffs present in terms of what the major federal action that they think triggers NEPA is the fact, in their view, that the number, the frequency of openings of the spillway now is more than what they contend was contemplated at earlier stages in the process. But NEPA is a decision tool, and for that reason, the important question for NEPA and whether there is a major federal action for NEPA purposes is whether the agency is making a decision to change the status quo with regard to its operating policy, not when it is simply applying that policy to contemporary environmental conditions. To the extent there is ever a circumstance where environmental changes to which the agency is responding are so different that the consequences alone could themselves transmute into a form of major federal action, this is not that case. Plaintiffs argue that the frequency of opening is different because they seize on the statement from the 1927 Jadwin Report, which says, without making any kind of hard and fast prediction, that based on past data, it was probable that the spillway would be opened once every five years. But that statement in the Jadwin Report does not show that there was a contemplation that it would only be opened every five years, and in fact, when that report is read as a whole, I think it's quite clear that the contemplation that they had in mind was that the spillway would be opened as often as needed to prevent the flow that is too much for the downstream levees to handle from being passed to the City of New Orleans and population centers. For that reason, there is no change in the operations of the Bonny Cary Spillway. And because there is no change in the status quo, there is no major federal action. I don't want to discount the serious concerns that the plaintiffs have with regard to the operation of that spillway, but their recourse, if they want to change a program that Congress authorized many years ago, is to go to Congress. Likewise, their recourse, if they want there to be a requirement to do some kind of retrospective environmental analysis when Congress has not imposed any kind of retrospective requirement, is to go to Congress. And I would note, Your Honors, that as was discussed in the briefing in the District Court, although not in the appellate briefing, in fact, in 2020, as part of the Water Resources Development Act that was passed, Congress did direct the Corps to look into the operations in the lower Mississippi River and to develop recommendations potentially for Congress as to whether there should be some rethinking of the way that the entire operation is run. So putting aside the average, whether it's the actual average or the projected average way back when, has there ever been a time period focusing on the number of years that the plaintiffs are in this case? Has there ever been a time period where the spillway has been operated as frequently as it has been over a span of years? So there is not one that is, if you're looking at 2016 to 2020, that is that many. There was a period between 1973 and 1983, so ten years in which there were four openings. Not exactly as many, but I would say comparable. And while this is outside the record because it takes place outside of the time period before the plaintiffs had filed, it is worth noting that there was no opening in 2021, and to date there has not been an opening in 2022. So I think it's difficult to sort of just look at these short pieces of a longer history. It would seem unlikely that there would be an opening in 2022, given that we're here in July. It's always been assumed that it would be open and operated as needed. Is that? That is correct, Your Honor. The decision Congress made was that passing more flow than the downstream levies could safely handle is not an option. It's a discretionary call based on the data, the current data. That's correct. There is a trigger that was included in the Jadwin report regarding the flow discharge that the court applies. The court does have some flexibility. It doesn't have the discretion to provide less protection than Congress required, but it does have some flexibility to potentially keep the spillway open longer as needed to protect life and property in New Orleans and the integrity of the downstream levies. Your Honor, unless you have other questions, I don't want to take more of your time than is needed. I would simply say that, again, to the extent that the plaintiffs want to force a reconsideration of something that Congress already decided in the absence of any new major federal action, their recourse is to Congress and not to this judicial action. For that reason, we ask that this court affirm the dismissal. All right. Chief Judge Richman, other members of the panel, there's one thing I would note for the court, and that's I do think that this court's decision in Louisiana Wildlife Federation v. York is still relevant here, in which the court said the principal factor an agency should consider in exercising its discretion to supplement existing EIS because the new information is it presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS, which is clearly the case here. And, Judge Ho, we talked about what was contemplated language there, and I think that in the context of the National Environmental Policy Act and its action-forcing, public-informing principles, that clearly implies also a range of reasonableness where drastic consequences associated with operations that do differ from what traditionally was thought was going to happen are something that should allow the public to have that information and should require the agency to look at that. Thank you.